34379. AETNA CASUALTY & SURETY COMPANY *et al.* *v.* McCULLUM.

DECIDED FEBRUARY 28, 1953.

*Ben Weinberg Jr., T. J. Long, Nick Long Jr.,* for plaintiff in error.

*Wm. Hicks Key, Harry E. Monroe, T. Elton Drake, John M. Williams,* contra.

FELTON, J. The claimant and the aluminum company in March of 1951 entered into an agreement for the painting of certain of the company's property. The injuries for which claim is made occurred when the claimant fell from a water tank he was painting for the aluminum company under such agreement. The question for determination is whether the claimant was the company's employee or an independent contractor when the injuries were sustained. The claimant contends that he was an employee because the company assumed the right to and actually did control the time, manner, and method of executing the work he was performing. Construing the claimant's testimony against him, it shows that he was an independent contractor and not an employee. He testified in part as follows: "Q. But what relations did you have with the Enterprise Aluminum Company in March and April of last year? A. Well, Mr. Jack Mosley sent me a message by Andrew Martin that works there in Shady Dale that Mr. Miller and Mr. Mosley wanted to see me about doing some work. We went down there, we—me and my boy. . . So, we go down there. He told me he wanted a smokestack, two cyclones, and a water tank cleaned and painted. Now, I am going at it as near and true, in the best of my knowledge of how it was. He asked me what it would cost. I said: 'Well, I just really don't know. I can't exactly tell you, sometimes you can get fooled. You want to use the Huglor paint? It is a good kind of paint. I tell you what I'll do. I'll take it on hours figured and hours worked basis. Whatever gallons of paint it takes for the job, that's all you will pay for.' He said: 'Go ahead, get the paint, and come on down there.' I went to work. He told me, he said: 'When you go to work you can go in at 7, you don't have to come out with the shift, if you want to stay along with the

work, just do it, and do it right.' Q. He told you to go to work at 7? A. He said it was up to me, if I was called to work, to go to work and do whatever I was doing, and then we went to work in there. . . Q. Now, what about the pay? Was he going to pay you by the hour? A. There was no understanding on what I charge an hour, exactly, nothing on that question. Q. What about the job? A. That's what I said. Mr. Miller has confidence in my work, he told me to go ahead and do it. I said: 'I don't think it will run over four hundred dollars'. . . Q. Did you buy that paint in Atlanta, yourself? A. Yes. Q. Did you pay for it, or who paid for it? A. I still owe $55 on it. Q. You still owe? A. Yes, sir. Q. Understanding was you were to pay for it at the time? A. As far as the Huguley knew, yes. . . Q. Well, now, how much did you get for doing this job? A. Mr. Miller brought me out to the hospital a check for $400. That's what the check was. Q. $400. How many hours work did that cover? A. Well, now, that one thing has come up. He come out there and asked me, I told him, he said there, it ranges from a little better than 37 days. I always liked Mr. Miller, and I always done a lot of work. He said: 'Will $400 be all right?' I said: 'Yes'. That is what was settled. Q. Isn't the amount he paid you the amount agreed on when you took the job? A. Not that. I told him I would try to keep it from going over that. . . Q. Now, this check was for everything, it balanced you out with him? A. Yes, sir. . . Q. Mr. Mc-Cullum, what other equipment did you need to use on that work down there? Did you have to have any equipment? Did you have hooks, rope, a car, or ladders? A. Yes, I had hooks, ropes, blocks, brushes, wire brushes and spray guns. Q. Who does that equipment belong to? A. Belongs to me, that's right. . . A. There was just no agreement on what paint it would take, or what amount of hours, or the cost. Only thing I said: 'I don't believe it will go over $400.' Now, that's as near straight and correct as I possibly know. Q. Was anyone helping you on this job? A. My boy was helping me. Q. Who paid him? A. I paid him. Q. Enterprise didn't pay him? A. No, I paid him. . . Q. Did you have any understanding with the company about hiring your son or somebody else to work for you? A. No more than him, no. Q. No more than him? A. He is the only

one helped me on it. Q. He had no understanding with the company as to pay he was to receive from the company, is that what you are trying to say? A. No, he wasn't working for the company. He was looking to me because I traded with them on it. . . Q. Now, you were told you could work as long as you wanted to, he left it up to you, when you wanted to, just get the job done? A. Yes, that's right. Q. The company didn't exercise any control over you? All they wanted was results, is that right? A. Well, I don't know what you are getting at there, I suppose so. That's all, only I was to do it right and do it like they wanted it done. Q. The agreement was, you was to paint this tower, do it right and get your money? A. Cracks, and corking, and all, yes. Q. Let me ask you this. Who was that paint charged to? You or the aluminum company, who was it billed to? A. It was ordered in my name, it was billed and charged to me, yes."

This evidence shows that the claimant was hired to paint the water tank as an independent contractor, and that the aluminum company did not reserve the right to control the time, manner, and method of executing the work, but rather the right merely to require certain definite results in conformity to the agreement. *Richards* v. *Marco Realty Co.*, 57 *Ga. App.* 242 (194 S. E. 880); *Employer's Liability Assurance Corp.* v. *Smith*, 86 *Ga. App.* 230 (1, 2) (71 S. E. 2d, 289). The claimant relies strongly on one incident to show that the aluminum company retained the right to control the manner and time of executing the work. He contends that he was stopped from painting one day by the company because paint was being blown by a high wind onto cars in a parking lot below the tank. Concerning the incident the claimant testified: "Now, I was laid off two or three days on account of high winds on the automobiles. Q. Who told you to lay off? A. Mr. Jack come up and—come up there and said Mr. Miller told us to watch that. He moved the cars. He said: 'You better stop on account of the wind.' Q. That was where the aluminum paint was blowing off on somebody else's car? A. Yes, they worked there. I imagined the cars—it was blowing on the ones that worked there. In fact, I know that, but who's it was, I don't know that, and outside of that—that's as far as I know on it. . . Q. Mr. McCul-

lum, do you generally paint on a tower when the wind is blowing strong? Was it your practice to get on a high tower and paint if it was bad weather? A. Well, I have in high wind, but not in the rain. Q. But you quit of your own accord, because it was windy or raining, and you didn't work? A. Not when I can get by, I have done it a lot. Q. You couldn't get by with it that day? A. I was getting by until they told me to stop. . . Q. Well, tell me his exact words. What did he say, if he stopped you? A. He first moved some of the cars. Then the wind was still blowing it. Mr. Jack Mosley said: 'You are going to have to stop, or the wind is going to ruin these cars.' I said: 'I can't stop this wind.' It was terrific and high speed. I didn't come back. . . Q. Now, one thing I want to get you to clarify. When you were painting and the wind was blowing on this tower, you testified someone, I never did get it clear, someone told you you better quit. Now, you have been doing this steeple-jack work for years. Do you have to be told to quit, if you find the paint is falling on people's cars, or do you quit of your own accord? A. Well, sometimes I quit, if everything is clear I go right on, but up there, I didn't see no paint getting on it. He sent word up to move the cars, we kept on it. I thought we were in the clear. Q. What I asked you was: If you saw the wind was blowing paint, and the paint is falling on the—on something, do you quit, or do you have to be told to quit? A. Well, that depends. Q. Well, are you testifying that if you saw paint falling on cars, you have to be told to quit? A. Well, I do the best I can, if I was hired, that's the only reason I believe in. Q. You don't have to be told to quit, if you see paint is falling on cars? A. I go the limit, I want to quit. Q. I don't understand? A. I believe in being right. I don't want nobody to paint your cars and I don't believe in doing other people like I don't want them to do me. . . Q. What I am asking; right at this particular time, when you testified you were told to quit painting —? A. Well, to be just as true as you can be. You'll be up there, that paint is going on the ground, you wouldn't see it or know it. I told it, like I said, if I had seen it, I would have quit. I would be square with you, if I hadn't quit, I would have come down and asked about it."

A. J. Miller testified for the company: "Q. . . Now, do you recall paint blowing from where he was working onto the cars? A. Yes. Q. Did you stop him? A. Wind was blowing very bad, was blowing on our employees' cars. You know what aluminum paint on cars is. I got hold of Mr. Mosley. We decided we better move some of the cars. We did move some of the cars. The wind was blowing very high. A man up on the tower couldn't tell how far that aluminum paint was blowing. The paint is light and carries a long distance. It was getting onto several of the cars, at least 75 to 100 feet away from there, it was. Q. I asked you if you stopped him from doing the painting? A. He came down, we discussed it, we decided that was the thing to do. Q. You ordered him to stop? A. I didn't order him, we discussed it. We both decided that was the thing to do. . . Q. What did you tell him at that time? A. That we better quit until the wind had subsided, so there wouldn't be any damage to these cars. Q. You told him that? A. Yes. Q. And he stopped? A. Yes."

This evidence, even construed in favor of the claimant, shows that officials of the company merely brought to the attention of the claimant (who testified that he would have quit painting on his own initiative had he known the paint was still blowing on the automobiles) that they could not move the automobiles out of the range of the blowing paint, and that paint was still falling on the cars, and that they mutually agreed the painting should be suspended during the blowing of high winds.

The claimant introduced in evidence a copy of a contract between himself and the company for similar work, which contract was dated March 29, 1949, and contained the following provision: "Party of the second part [claimant] agrees to assume any and all liability for injury to himself, his workmen and damage to property while on said job." The claimant testified that he had previously done work of the company under similar contracts. It is contended that because in all dealings with the company on previous paint jobs a contract similar to the one put in evidence was entered into, and because the claimant and the company did not on the occasion in the instant case enter into such a contract, the parties intended that the claimant be an employee and not an independent contractor. We do

not agree. It is just as feasible to say that because they had entered into such contracts on prior occasions they intended to continue to work under such conditions and have the same relationship that existed under such prior contracts.

The evidence demanded a finding that the claimant was an independent contractor and not an employee, and the court erred in affirming the board's award.

*Judgment reversed. Sutton, C. J., and Worrill, J., concur.*